**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\*\*\*

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 2:16–cr–152–LRH–VCF |
| vs. | **REPORT & RECOMMENDATION** |
| CHARLES MICHAEL GOFF, | |
| Defendant. | |

Before the court are Goff's motion to suppress (ECF No. 18), the Government's response (ECF No. 29), and Goff's reply (ECF No. 30). This court held evidentiary hearings at 1:00 p.m. on November 15, 2016 and at 1:00 p.m. on November 18, 2016. For the reasons stated below, Goff's motion should be granted.

**I. Background**

On May 1, 2016, at approximately 1:35 a.m., Officer Bergman Gadea stopped a red Mitsubishi Eclipse for running a red light. (ECF No. 19)[1] Officer Joseph Aguilos arrived soon at the scene to assist. (*Id.*) Officer Gadea made contact with the driver, Carmen Reyes. (*Id.*) Officer Aguilos approached the passenger, Defendant Charles Goff. (*Id.*)

Officer Gadea asked Reyes a few basic questions related to the traffic stop. (*Id.*) During the course of the questioning, Reyes and Goff admitted that they did not have valid driver's licenses. (*Id.*) Additionally, Reyes was unable to produce valid insurance for the vehicle. (*Id.*) Goff informed the officers that he had an extensive criminal history, but did not believe that he had any warrants. (*Id.*)

---

[1] Docket entry 19, marked as Defense Exhibit B, is video footage from Officer Gadea's body camera. The clip is approximately 30 minutes long, and begins shortly after the traffic violation and concludes immediately after Reyes is cited.

The officers told Reyes and Goff they "would be right back," instructed the two to remain in the vehicle, and walked back to Gadea's patrol car. (*Id.*) Officer Gadea then said, "I might pull the passenger out." (*Id.*) At the evidentiary hearing, Officer Gadea testified that he based his decision on Goff's prior arrest for grand larceny auto and Reyes's inability to provide the registered owner's name.

Officer Gadea asked Officer Aguilos to "run them. And then we'll see." According to Officer Gadea, he input Goff's name into his patrol car's computer, and relevant information, such as DMV records, active warrants, and criminal history, was retrieved. The first return is Goff's criminal history, which contained multiple felonies. (*Id.*) A registration check confirmed that vehicle was properly registered, and had not been reported stolen. After reviewing Goff's history, Officer Gadea commented, "Ok. We can definitely pull him out in a second." (*Id.*)

Officer Gadea confirmed that Reyes's driver's license was suspended. (*Id.*) It appeared that Reyes's criminal history was retrieved at about the same time. (*Id.*) Based on the records checks, Officer Gadea, planned on giving Reyes, but not Goff, a ticket. (*Id.*) Officer Agulios suggested that they try and obtain consent to search the vehicle. (*Id.*) Officer Gadea agreed.

Officer Gadea removed Reyes from the vehicle first and directed her towards Officer Aguilos. (*Id.*) Officer Gadea opened the driver-side door and leaned in to speak with Goff. (*Id.*) The officer asked Goff where he was from, and ordered Goff to step out of the vehicle. (*Id.*) Once Goff was out of the vehicle, Officer Gadea ordered him to "keep your hands where I can see them" and asked if he could pat him down. (*Id.*) Goff appeared to agree; at this point Officer Gadea placed Goff's hands behind his back, and held them there while he conducted a patdown search. (*Id.*)

The officer asked if Goff had anything contraband on his person. (*Id.*) Goff said he had two pipes, one in his shirt pocket and one in his pants pocket. (*Id.*) At this time, Goff was placed in handcuffs. (*Id.*) Officer Gadea assured Goff that he was not under arrest. (*Id.*) A full patdown search

uncovered two pipes, two cell phones, a wallet, and a bag of candy. (*Id.*) The officer then asked Goff if he had any possession in the car. (*Id.*)

Goff told him he owned a cup, a can, and a backpack. (*Id.*) Officer Aguilos retrieved these items from the vehicle. (*Id.*) Officer Gadea then told Goff that once they were done, he and Reyes would have to walk to their final destination. (*Id.*) Officer Gadea asked about the contents of the backpack. (*Id.*) Goff replied that there were some "points" in the backpack. (*Id.*) Officer Gadea asked, "do you mind if my partner takes a look?" Goff answered, "No. I got into with my girlfriend."

Although not clearly captured by the body camera, Officer Aguilos began removing items from Goff's backpack. (*Id.*) This search revealed prescription drugs and a set of burglary tools. (*Id.*)

Officer Gadea searched the car. (*Id.*) This search did not uncover any weapons or contraband. (*Id.*) After the search, Officer Gadea walked backed to his patrol car and began writing Reyes's a citation. (*Id.*) Goff can be seen conversing with Officer Aguilos, who is off camera. (*Id.*) The body camera did not record their conversation. At one point, Officer Gadea told Officer Aguilos, "I haven't read him by the way." (*Id.*) At the evidentiary hearing, Officer Aguilos testified that it was at this point that he read Goff his *Miranda* rights. When asked if he understood his rights, Goff responded, "yes, sir." The recitation of the warning and Goff's statement were not recorded on Officer Gadea's body camera.

Officer Gadea completed the traffic stop by issuing Reyes a traffic citation. (*Id.*) At this point, Officer Gadea's body camera footage ends.

After completing the stop, Officer Gadea decided to arrest Goff for unlawful possession of burglary tools. (ECF No. 18-1 at 3) While loading Goff into the backseat of his patrol car, a black handgun fell from Goff's ankle. (*Id.*) Goff claimed that he had purchased it from a friend. (*Id.*) A record check revealed the gun was stolen. Based on this information, Goff was also arrested for

3

possession of a stolen firearm and possession of a firearm by a prohibited person. Goff was later indicted on one count of being a felon in possession of a firearm.

During the evidentiary hearing, a second body camera video was played. This video showed Officer Gadea's reaction to the gun falling on the ground. It also showed Officer Gadea conducting a second, more thorough patdown search. At this time, Officer Gadea asked Goff questions about the gun. Goff made several incriminating statement about the gun, including that he had purchased it from a friend. Neither the first nor the second video showed Officer Gadea giving Goff any *Miranda* warnings. Officer Gadea testified that Officer Aguilos had *Mirandized* Goff earlier in the stop, and he had been relying on these prior warnings.

Goff now moves to suppress the firearm as a fruit of his unlawful seizure as well as statements he made about the gun.

## II. Discussion

1. <u>Metro Officers Unreasonably Prolonged the Traffic Stop</u>

"[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S.Ct. 834, 837, 160 L.Ed.2d 842 (2005). "A seizure that is justified by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id.*

"Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate th[at] purpose." *Rodriguez v. United States*, ─── U.S. ───, 135 S.Ct. 1609, 191 L.Ed.2d 492 (2015)(internal quotations omitted). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.*

/// /// ///

a.  *Criminal History Report*

"Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to [the traffic] stop." *Id.* (internal quotations omitted). "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.*

"Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave." *Arizona v. Johnson*, 555 U.S. 323, 327, 129 S.Ct. 781, 784, 172 L.Ed.2d 694 (2009). "An officer's inquiries into matters unrelated to the justification for the traffic stop … do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Id.* "The critical question, then, is not whether the [additional inquiry] occurs before or after the officer issues a ticket, … but whether [the inquiry] 'prolongs' —*i.e.* adds time to— 'the stop.'" *Rodriguez*, 135 S.Ct. at 1616; *see also Caballes*, 543 U.S. at 409, 125 S.Ct. at 838.

In *Caballes*, a state trooper stopped the defendant for speeding. 543 U.S. at 406, 125 S.Ct. at 836. While the first trooper was writing the defendant a warning ticket, another state trooper arrived. *Id.* The second trooper was a member of the state's drug interdiction team and had a drug-detection canine with him. *Id.* While the ticket was still being written, the drug canine was walked around the vehicle. *Id.* The canine alerted to the presence of marijuana. *Id.* The defendant was immediately arrested for possession of marijuana. *Id.*

The Supreme Court held that the dog sniff was not a cognizable infringement on the defendant's Fourth Amendment rights. *Id.* at 409. For this court's purposes, it is important to note that the Court held that the dog sniff did not unreasonably prolong the traffic stop. *Id.* The dog sniff was conducted

while the defendant was being issued a warning citation. *Id.* The initial traffic encounter had not ended; thus the dog sniff could not have added any time to the stop. *Id.*

In contrast, a dog search or other investigatory procedure may infringe on a defendant's Fourth Amendment rights if it unreasonably prolongs the traffic stop. *See Rodriguez*, 135 S.Ct. at 1612. In Rodriguez, the officer had "gotten all the reasons for the stop out of the way," when he asked if the defendant would consent to a dog sniff. *Id.* at 1613. The defendant refused. *Id.* The officer ordered the defendant to remain at the scene until a drug canine could conduct a sniff of his vehicle. *Id.* The dog alerted to the presence of drugs. *Id.* The defendant was arrested for possession of methamphetamine. *Id.* The Supreme Court held that the defendant's detention pending the arrival of the drug canine violated his Fourth Amendment rights. *Id.* at 1616. The officer conceded that the purpose of the stop had been completed. *Id.* There was no traffic-mission-based reason for the continued detention. *Id.* The officer therefore needed independent reasonable suspicion to support his decision. *Id.*

Here, the criminal background did not violate Goff's Fourth Amendment rights. While the Metro officers checked DMV records and verified that neither individual had outstanding warrants, they conducted criminal background checks. (ECF No. 19) It is clear from the body camera video that the criminal background check occurred contemporaneously with warrant and DMV record searches, and before the officers decided the outcome of the traffic encounter. (*Id.*) The criminal background check is akin to the dog sniff in *Caballes*. Both were conducted before the initial traffic stop had or should have concluded. *Caballes*, 543 U.S. at 409. As with the *Caballes's* dog sniff, the criminal records check did not violate Goff's Fourth Amendment rights. *See id.*

    b.  *Continued Investigation*

"For the duration of a traffic stop, … a police officer effectively seizes everyone in the vehicle, the driver and all passengers." *Johnson*, 555 U.S. at 327, 129 S.Ct. at 784. "[A]n officer may prolong a

6

traffic stop if the prolongation itself is supported by independent reasonable suspicion." *United States v. Evans*, 786 F.3d 779, 788 (9th Cir. 2015). "[R]eaonsonable suspicion exists when an officer is aware of specific, articulable facts, which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion." *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000)(en banc)(emphasis in original). "[T]he officer in question must be able to articulate more than … [a] hunch of criminal activity." *Id.*

The officers' decision to search Reyes's vehicle unquestioningly prolonged the stop: it transformed what should have been a 6-minute encounter into a 30-minute investigation. The question now is whether the prolongation was unreasonable under the circumstances. This court finds that it was unreasonable.

Approximately 6 minutes into the traffic encounter, the officers had completed their records and background checks and had decided Reyes would get a ticket, but Goff would not. At that point, the traffic stop should have ended. *Evans*, 786 F.3d at 788. Officers should have issued Reyes a citation and watched Reyes and Goff walk towards their final destination. Instead, the officers decided to remove both individuals from the vehicle and investigate other criminal activity.

The moment the officers decided to issue Reyes a citation, their traffic mission was over. *See id.* The traffic stop had shifted into an investigation of general criminal activity. *See id.* Thus the officers needed independent reasonable suspicion to conduct this additional investigation. Based on the body camera footage and Officer Gadea's testimony, this court cannot find such justification.

Officer Gadea testified that he wanted to "pull" Goff from the vehicle based on Goff's prior arrest for grand larceny auto and Reyes's ignorance about the registered owner's identity. However, once he had run the vehicle's registration, Officer Gadea learned that the vehicle was properly registered and had not been reported stolen. This fact strongly negated Officer Gadea's initial suspicion. *Thomas*

7

*v. Dillard*, 818 F.3d 864, 877 (9th Cir. 2016)( "a frisk is not justified when additional or subsequent facts dispel or negate the suspicion.") Once he had learned that the vehicle had not been reported stolen, the only articulable fact Officer Gadea could have relied on was Reyes's lack of knowledge. This fact, by itself, does not provide Officer Gadea with reasonable suspicion to continue his investigation. *See Moreno v. Baca*, 431 F.3d 633, 643 (9th Cir. 2005).

The Government argues that Goff lacks standing to challenge the search of the vehicle. (ECF No. 29) On this point, the Government is correct. *United States v. Pulliam*, 405 F.3d 782, 786 (9th Cir. 2005)("As a passenger with no possessory interest in the car Richards was driving, Pulliam 'has no reasonable expectation of privacy in a car that would permit his Fourth Amendment challenge to a search of the car.'") However, "a defendant may lack the requisite possessory or ownership interest in a vehicle to directly challenge a search of that vehicle, the defendant may nonetheless contest the lawfulness of his own detention and seek to suppress the evidence found in the vehicle as the fruit of the [defendant's] illegal detention." *United States v. DeLuca*, 269 F.3d 1128, 1132 (10th Cir. 2001).

This is exactly what Goff's seeks in his motion to suppress. The moment Reyes was stopped, Goff, a passenger in the vehicle, was seized for Fourth Amendment purposes. *Johnson*, 555 U.S. at 327, 129 S.Ct. at 784. Goff is not challenging the search of the vehicle, which turned up no contraband. Rather he challenges his detention and seeks to suppress the firearm discovered during the course of his illegal detention.

The Government also argues that Metro officers were justified in ordering Reyes and Goff out of the vehicle based on a concern for officer safety. (ECF No. 29) While "an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely," *Rodriguez*, 135 S.Ct. at 1616, such concerns were not addressed by the removal of the vehicle's occupants. When they removed Reyes and Goff from the vehicle, Metro officers had already decided how to resolve the traffic

violation. (ECF No. 19) It would have been safer to cite Reyes and allow the two to leave the scene. *See Evans*, 786 F.3d at 787("Zirkle would have been safer had he left Evans go once he determined there was no reason to cite him.") Instead, the officers escalated the danger of the encounter by prolonging the stop and arguably providing more opportunities for Reyes or Goff to escape or harm the officers. Thus an officer safety rationale cannot justify the officers' decision to prolong vehicle stop.

2. <u>The Patdown Violated Goff's Fourth Amendment Rights</u>

"To justify a patdown of the driver or a passenger during a traffic stop, however, just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Johnson*, 555 U.S. at 326, 129 S.Ct. at 784.

In *Johnson*, police officers pulled over a vehicle for a traffic violation. *Id.* at 327. There were three individual in the car: the driver, a front-seat passenger, and a rear-seat passenger. *Id.* The defendant was the rear-seat passenger. The lead officer ordered the driver out of the car and asked him questions related to the traffic violation. *Id.* at 328. Another officer noticed the defendant, who was wearing the colors of the Crips street gang, avoided eye contact, and appeared to have a police radio scanner in his front pocket. *Id.* Suspecting that the defendant was a gang member and might be armed, the officer ordered him out of the vehicle. *Id.* During a patdown search, the officer felt a handgun in the defendant's waistband. *Id.* He was immediately arrested. *Id.*

The Supreme Court held officers needed reasonable suspicion that an individual was armed and dangerous before conducting a patdown search of a vehicle's occupant. *Id.* at 334. Even though the patdown did not unreasonably extend the duration of the stop, officer still needed reasonable suspicion that the passenger was armed and dangerous before they could conduct a patdown. *Id.*

Even if the officers' decision to remove Goff from the vehicle did not violate his Fourth Amendment rights, the subsequent patdown did. Officer Gadea was required to have "specific, articulable facts, which, when considered with objective and reasonable inferences, form a basis for particularized suspicion" that Goff was armed and dangerous. *Montero-Camargo*, 208 F.3d at 1129. This could not have been the situation.

When considering whether a suspect is armed and dangerous,

> [R]elevant considerations may include: [1] observing a visible bulge in a person's clothing that could indicate the presence of a weapon; [2] seeing a weapon in an area the suspect controls, such as a car; [3] sudden movements suggesting a potential assault or attempts to reach for an object that was not immediately visible; [4] evasive and deceptive responses to an officer's questions about what an individual was up to; [5] unnatural hand postures that suggest an effort to conceal a firearm; and [6] whether the officer the observes anything during the encounter with the suspect that would dispel the officer's suspicions regarding the suspect's potential involvement in a crime or likelihood of being armed.

*Thomas*, 818 F.3d at 877.

Nothing in the body camera footage would lead a reasonable officer to suspect that Goff was armed and dangerous. (ECF No. 19) Goff answered Officer Gadea's questions and complied with instructions to exit the vehicle for a patdown search. Goff did not hesitate to exit the vehicle nor did it appear that he was reaching for a weapon. *Cf. United States v. Burkett*, 612 F.3d 1103, 1107 (9th Cir. 2010)("Objectively viewed, Burkett's furtive movements …, his evasive and deceptive responses …, the peculiar way he opened the door with his left hand, and the way he kept his right hand near and reached for his right coat pocket when he got out of the vehicle, would justify an experienced law enforcement officer's belief that Burkett was armed and dangerous.") Indeed, Goff's demeanor and conduct suggested an individual under the influence, not one who was armed and dangerous. (ECF No. 19)

At best, Officer Gadea had a hunch, based on Goff's criminal history, that criminal activity was afoot. He testified that Goff's baggy clothing was the only fact that made him suspect that Goff was

armed. While baggy clothing may in some circumstances contribute to an officer's reasonable suspicion, it cannot, by itself, give an officer reasonable suspicion that an individual is armed and danger. *See Thomas*, 818 F.3d at 877 ("That a person is normally dressed does not give rise to reasonable suspicion the person is armed and dangerous. Otherwise, innumerable college students everywhere could be frisked for weapons on appearance alone.")

The Government also argues that Goff consented to the patdown search, and thus the search was lawful. The body camera footage undercuts this argument. "It is well-established that consent is a recognized exception to the Fourth Amendment's protection against unreasonable searches and seizures." *United States v. Russell*, 664 F.3d 1279, 1281 (9th Cir. 2012). "[I]t is the government's burden to show consent was given freely and voluntarily." *Id.* The Ninth Circuit has instructed courts to consider five factors when determining whether the voluntariness of consent:

> (1) whether defendant was in custody; (2) whether the arresting officers have their guns drawn; (3) whether *Miranda* warning have been given; (4) whether the defendant was told he has a right not to consent; and (5) whether defendant was told a search warrant could be obtained.

*Id.*

"The fact that some of these factors are not established does not automatically mean that consent was not voluntary." *Id.*

Goff's interaction with Officer Gadea can hardly be characterized as consensual. Officer Gadea instructed Goff to set out of the vehicle, raise his hands, and keep his hands where he could see them. (*Id.*) Only then was Goff asked to consent to a patdown. (*Id.*) Once consent was given, Officer Gadea immediately told Goff to place his hands behind his back. (*Id.*) From there the situation became more custodial; Goff told the officer he had drug paraphernalia and was then placed in handcuffs.

Although Officer Gadea did not have his weapon drawn and did not threaten Goff with a search warrant, the *Russell* factors weigh in favor of finding his consent was involuntary. Goff was not read his *Miranda* rights nor was he told he could refuse to consent.

Finally, the circumstances under which Officer Gadea obtained consent were of a custodial nature. Courts consider the following factors when determining whether an individual is in custody:

> (1) the number of officers; (2) whether weapons are displayed; (3) whether the encounter occurred in a public or non-public setting; (4) whether the officer's officious or authoritative manner would imply that compliance would be compelled; and (5) whether the officer advised the detainee of his rights to terminate the encounter."

*United States v. Brown*, 563 F.3d 410, 415 (9th Cir. 2009).

In rapid succession, Goff was instructed to leave the vehicle, raise his hands, and keep his hands in the air. (ECF No. 19) Although the officer was polite and phased his instructions as request, it is doubtful that the Officer Gadea or Goff concluded that Goff could terminate the encounter at any time. (*Id.*) The traffic stop occurred late at night in a deserted parking lot. (*Id.*) Goff was firmly told to exit the vehicle and walk towards the bright lights of Officer Gadea's patrol vehicle. (*Id.*) Based on these objective circumstances, Goff was in custody at the time he gave his consent. On balance, the *Russell* factors favor a finding that Goff's consent was involuntary.

Officer Gadea's patdown was not justified by reasonable suspicion that Goff was armed and dangerous. Nor was it justified by Goff's consent. The patdown therefore violated Goff's Fourth Amendment rights.

3. <u>Goff was *Mirandized*</u>

The Fifth Amendment guarantees no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend V. From this guarantee, courts derived the *Miranda* rule, which states that "the prosecution may not use statements … stemming from custodial interrogation of

the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 446, 444, 86 S.Ct. 1602, 1612 (1966). The *Miranda* decision also "established certain procedural safeguards that require police to advise criminal suspects of their rights under the Fifth and Fourteenth Amendments before commencing custodial interrogation." *Duckworth v. Eagan*, 492 U.S. 195, 202, 109 S.Ct. 2875, 2880, 106 L.Ed.2d 166 (1984).

"In now-familiar words, the Court said that the suspect must be told that 'he has [1] the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id.* at 201-02 (1989).

Officer Gadea testified that he relied on Officer Aguilos's *Miranda* warning when he interrogated Goff. Officer Gadea never heard Officer Aguilos give Goff a *Miranda* warning and was solely relying on Officer Aguilos's own assertion. Officer Gadea can be heard telling Officer Aguilos that "I haven't read him by the way," and Officer Aguilos testified that he gave Goff a *Miranda* warning shortly thereafter. This court finds Officer Aguilos's testimony credible, and concludes that Goff was read his *Miranda* rights shortly after Officer Gadea's aforementioned comment.

Goff argues that the evidence does not support this finding. Officer Aguilos testified that he gave Goff a Miranda warning at approximately 2:00 a.m. However, the officer's police report states the warning was given at approximately 2:36 a.m. From this discrepancy, Goff argues that neither officer gave him a *Miranda* warning, and that Officer Aguilos incorrectly documented the warning in his police report. Considering the inconsistency in light of all other circumstances, the court is not persuaded by Goff's argument.

Based on the officers' testimony, this court finds that the Government has shown that Goff knowingly and intelligently waived his *Miranda* rights. *See United States v. Rodriguez*, 518 F.3d 1072,

1080 (9th Cir. 2008). However, as will be explained below, the statements about the handgun should still be suppressed as a fruit of the poisonous tree.

4.  Fruits of the Poisonous Tree

"[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also the evidence later discovered and found to be derivative of illegality or 'fruit of the poisonous tree.'" *Segura v. United States*, 468 U.S. 796, 804, 104 S.Ct. 3380, 3385, 82 L.Ed.2d 599 (1984). "It extends as well to the indirect as the direct products of unconstitutional conduct." *Id.*

"Whether derivative evidence is admitted or excluded will depend upon the precise role the illegal seizure in fact played in the subsequent discovery." *United States v. Smith*, 155 F.3d 1051, 1060 (9th Cir. 1998). "[C]ourts must determine whether anything seized illegally, or any leads gained from illegal activity, tended *significantly to direct* the investigation toward the specific evidence sought to be suppressed." *Id.* at 1061. (emphasis in original). "And although it is by no means clear precisely what constitutes significant direction sufficient to trigger the exclusion remedy, courts have deemed it probative whether the initial illegality led *directly* to any of the evidence actually used against the defendant at trial, or, to put the matter slightly differently, whether the government's evidence was the direct result of an unlawful search or seizure." *Id.* (emphasis in original).

Here, the firearm and statements about it are a direct result of Goff's unlawful seizure. Had the officer's not detained Goff beyond the point when the traffic stop should have ended or had they not unlawfully conducted a patdown, they would not have discovered any evidence that would give them have to arrest Goff. And without a basis for an arrest, the firearm would not have fallen from Goff's ankle holster as he was being loaded into the patrol car and he would not have made any statements about it. *See id.* Put another way, there is a direct causal chain between the unlawful seizure and the

handgun and the related statements.  This court concludes that the evidence was tainted by the initial illegality.  As the Government does not argue an exception to the exclusionary rule applies (ECF No. 29), this court will not undertake such analysis.  The firearm and statements should thus be suppressed as a fruit of the poisonous tree.

ACCORDINGLY, and for good cause shown,

IT IS HEREBY RECOMMENDED that Goff's motion to suppress (ECF No. 18) be GRANTED.

IT IS SO RECOMMENDED.

DATED this 29th day of November, 2016.

_____
CAM FERENBACH
UNITED STATES MAGISTRATE JUDGE